CYNTHIA RUBIN, Plaintiff-Appellee, v. MARSHALL FIELD AND COMPANY *et al.*, Defendants-Appellants.

First District (2nd Division)   No. 1—90—2498

Opinion filed July 14, 1992.

French, Kezelis & Kominiarek, P.C., of Chicago (Algimantas Kezelis, Russell P. Veldenz, and Patrick B. Cage, of counsel), for appellants.

Law Offices of Arthur S. Gomberg, P.C., of Chicago (Gregory A. Friedman, of counsel), for appellee.

JUSTICE McCORMICK delivered the opinion of the court:

Plaintiff, Cynthia Rubin, sued defendants, Marshall Field & Company (Fields) and Princess Marcella Borghese, Inc. (Princess Marcella), for injuries caused by cosmetics that defendants marketed. A jury awarded plaintiff damages for breach of implied warranty of fitness for a particular purpose and for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1985, ch. 121½, par. 261 *et seq.*). Defendants appeal from the judgment entered on the verdict and from the trial court's award of attorney fees.

On April 5, 1986, plaintiff purchased instant eye makeup remover distributed by Princess Marcella from Fields. That night she used the product to remove her eye makeup. Her eyelids and the skin around her eyes turned red, became taut and rough and started to sting. She washed the skin repeatedly and kept a cold washrag on her eyes all night. Two days later, when the burning did not subside, she called an ophthalmologist, and she went to see him the next day. He told her that she had contact dermatitis and he prescribed an ointment.

A few weeks later, because the burning and roughness of her eyelids persisted, plaintiff decided to see Dr. Katherine Wier, a dermatologist. Dr. Wier prescribed a similar ointment and told plaintiff that the chemical which was causing the burning would remain in her system for three or four months. The stinging subsided, but plaintiff could not wear eye makeup again regularly until summer 1987. When she tried to wear makeup again before that, her eyelids turned bright red and began swelling upon removal of the makeup.

In March 1988, plaintiff filed her four-count complaint. In December 1989, she amended her complaint to six counts, charging defendants in count I with violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1985, ch. 121½, par. 261 *et seq.*) (the Act or Consumer Fraud Act). She also sought to recover for her personal injuries on theories of breach of express warranty (count II); breach of implied warranty (count III); strict products liability (count IV); negligence (count V); and common law fraud (count VI). Defendants did not object to the amendment of the complaint or to trial by jury on any count of the complaint.

At trial plaintiff testified that when she went to Fields on April 5, 1986, she was not especially shopping for cosmetics. While browsing

she got into a conversation with Julianna Reiner, a sales clerk, and she told Reiner that she used Vaseline to remove her eye makeup. Reiner said Vaseline could clog her eye ducts and cause cataracts or other permanent eye damage. Reiner recommended Princess Marcella Borghese Instant Eye Make-Up Remover. Plaintiff asked if the product was safe and Reiner showed her the box, which said "recommended for all skin types." Reiner said, "if it wouldn't be safe for you, it wouldn't say this on the box." Relying on Reiner's representations, plaintiff purchased the product.

Defendants admit that Reiner was an agent for both defendants when she sold plaintiff the product. Reiner testified that she had no specific recollection of the transaction, but she never said anything about adverse effects of other products, and she "never use[d] the word [V]aseline, ever."

Dr. Wier testified that eyelid skin and genital skin is the most sensitive skin on the body, and very fair skin, like plaintiff's, is easily irritated. Dr. Wier could say with medical certainty that the makeup remover caused plaintiff's reaction, which was probably a primary irritant reaction compounded by an allergic reaction. Dr. Wier testified in her deposition that although the distinction is sometimes difficult to draw, an irritant reaction is an immediate skin reaction, like burning, which the irritant would cause on almost anyone's skin, while an allergic reaction is usually delayed and occurs only in persons with the allergy. She classified plaintiff's reaction as a primary irritant reaction because of the speed with which the reaction occurred. The detergent in the makeup remover was probably the irritant, opening the pores and allowing other chemicals, to which plaintiff was allergic, to penetrate the skin. She believed that some other people whose skin was as fair as plaintiff's would react adversely to the product, and "a few might have a similar disastrous reaction."

On cross-examination, Dr. Wier admitted that the detergent in the eye makeup remover was also used in at least three other products, including baby shampoo. She considered the eye makeup remover fairly safe.

Revlon, Inc., which owns Princess Marcella, manufactured the eye makeup remover. Dr. Earl Brauer, vice-president of medical affairs for Revlon research, testified that he tested the product plaintiff returned to defendants and found that it included only the proper chemicals with nothing extraneous added. He used the returned product in a skin patch test on 105 individuals chosen to represent the general population, and three had some reaction. He concluded that the product did not contain any irritant. He monitors personal injury com-

plaints for Revlon products, and with more than 50,000 units of the eye makeup remover manufactured since 1978, plaintiff is the first consumer to complain of adverse effects. He said that she must have had an idiosyncratic allergic reaction because the product does not contain any irritants.

Dr. Brauer admitted that if the concentration of the detergent were increased sufficiently, it could possibly become an irritant, but he doubted that it would act as such even in high concentrations. He had never heard of Vaseline causing cataracts or similar problems to the eye. He agreed with Dr. Wier's conclusion that plaintiff's injuries were a reaction to the eye makeup remover.

Defendants moved for directed verdicts on all counts. Based on Dr. Wier's testimony that the product was fairly safe, the court granted the motion as to the strict product liability count. Plaintiff then withdrew the negligence count. The court denied the motion as to all other counts.

The jury found for defendants on the express warranty and common law fraud counts, but it found for plaintiff on the implied warranty and Consumer Fraud Act counts. The jury awarded plaintiff damages of $1,250. Defendants filed a post-trial motion for a new trial, arguing that plaintiff failed to prove a defect in the product and a pattern of deceptive practices. At oral argument on the motion, defendants also contended that plaintiff had not shown an intent to deceive. The court denied the motion.

Plaintiff petitioned for $14,500 in attorney fees, and she supported the petition with an affidavit from her attorney, detailing work performed and charges for that work. Plaintiff contended that she was entitled to fees under both the Consumer Fraud Act and the Magnuson-Moss Warranty Act (15 U.S.C. §2301 et seq. (1982 & Supp. 1985)). Defendants did not object to the statutory bases for fees. After the hearing, the court awarded plaintiff fees of $7,500 for work on both counts upon which the jury found in her favor.

## I. BREACH OF IMPLIED WARRANTY
Defendants argue that this court should reverse the judgment for plaintiff on the cause of action for breach of implied warranty because plaintiff did not prove that there was any defect in the makeup remover and because the evidence showed that her reaction to the product was idiosyncratic.

The Uniform Commercial Code (UCC) (Ill. Rev. Stat. 1985, ch. 26, par. 2—315) provides:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

Therefore, under the statute, plaintiff needed to prove (1) a sale of goods; (2) before the sale the seller had reason to know (a) a particular purpose for which plaintiff bought the goods, and (b) that she was relying on the seller's skill to select goods suitable for that purpose; and (3) the goods were not suitable for that particular purpose. The action is in contract, not tort, based on the implicit promises

"derived from the interplay of a transaction's factual circumstances with the foreseeable expectations of a buyer \*\*\* who is protected by law in those expectations." *Collins Co. v. Carboline Co.* (1988), 125 Ill. 2d 498, 508, 532 N.E.2d 834.

Some cases have added a requirement that plaintiff prove the product was defective. (*141 S. Main, Inc. v. Magic Fingers, Inc.* (1977), 49 Ill. App. 3d 724, 364 N.E.2d 605; *Mullen v. General Motors Corp.* (1975), 32 Ill. App. 3d 122, 336 N.E.2d 338; *Van Winkle v. Firestone Tire & Rubber Co.* (1969), 117 Ill. App. 2d 324, 253 N.E.2d 588.) None of these cases makes reference to the UCC. The reasoning of these cases has been criticized. Anderson, in his commentary to the UCC, said:

" 'It is unfortunate that the warranty law has been so influenced by the tort law. With respect to negligence and strict tort, it is logical to require that there be a defect in the goods. In the case of warranty, it should be sufficient to impose liability that there has been a breach of warranty. In many cases, the breach of warranty consists of the presence of a defect that prevents the goods from being used. In other cases, the breach consists merely of failing to conform to the contract's standard. For example, when the seller delivers a red table instead of the green table required by the contract there is clearly a breach of warranty. Yet the red table was not defective in any intelligent sense of the word merely because it did not conform to the contract. \*\*\*

Many of the cases seek to make a quantitative distinction as to how dangerous a product must be in order to be classified as "defective." Yet there is not a warranty in the [Uniform Commercial] Code that could not be broken by a perfectly made product. Conformity to the standard, satisfaction of the mini-

mum criteria of the warranty of merchantability, [and] fitness for the particular purpose of the buyer are the criteria for determining whether warranties have been satisfied. Conversely, there is a breach of warranty by proof that these criteria have not been satisfied. Failure to satisfy the criteria are the significant matters without regard to whether the goods are "defective" or without a flaw.

The need for defining a defect becomes unnecessary insofar as warranty law is concerned if the matter is approached from the aspect of conformity or nonconformity, rather than in terms of whether there is a defect. The presence of a defect should be regarded as merely evidence of the fact that the goods are in such a condition that some warranty has been broken. If all the circumstances lead to the conclusion that the goods do not conform, there is a breach of warranty. It is unnecessary to determine whether what made them not conform is to be labeled a "defect." ' " 3 R. Anderson, Uniform Commercial Code §2—314:56, at 163 (3d ed. 1983), quoted in *Malawy v. Richards Manufacturing Co.* (1986), 150 Ill. App. 3d 549, 559-60, 501 N.E.2d 376.

■ We agree with Anderson and the appellate court in *Malawy*. Plaintiff's proof of breach of implied warranty was complete when she showed that defendants' agent implicitly warranted that the product would be safe for her skin in particular, and it was not suitable for that particular use. She did not need to prove in addition that the product was defective.

Defendants contend that they proved that plaintiff's reaction was idiosyncratic, and this provides an absolute defense to the implied warranty action. In *Stanton v. Sears Roebuck & Co.* (1942), 312 Ill. App. 496, 501, 38 N.E.2d 801, the court said:

" 'It can hardly be said that a vendor *** would be liable for a breach of an implied warranty solely because of the harmful effect due to a buyer's individual idiosyncrasy.' " Quoting *Barrett v. S.S. Kresge Co.* (1941), 144 Pa. Super. 516, 520, 19 A.2d 502, 503.

Following *Stanton*, the court in *Presbrey v. Gillette Co.* (1982), 105 Ill. App. 3d 1082, 1091-92, 435 N.E.2d 513, found that the idiosyncratic consumer is generally barred from recovery under theories of strict liability, negligence or breach of warranty. The court further held that "the rule of nonliability has been relaxed by some courts where the defendant has breached an express warranty of safety to the ultimate consumer." (*Presbrey*, 105 Ill. App. 3d at 1094.) The

court found that the evidence in that case could not support such a theory. Under *Stanton* and *Presbrey*, it appears that if plaintiff had no evidence of warranty beyond the fact that defendants offered the product for sale, her cause of action for breach of warranty would be defeated by proof that her reaction was idiosyncratic.

■ Plaintiff has presented considerable evidence beyond the sale itself to show that the warranty implied by defendants' acts in this case was far more specific. Plaintiff testified that after defendants' agent, Reiner, recommended the product, she asked whether the product would be safe for her. Reiner pointed to the box, which said "recommended for all skin types," and said "if it wouldn't be safe for you, it wouldn't say this on the box." Reiner could see plaintiff's skin and she knew of plaintiff's concern about the safety of the product for use on that skin. Under these specific factual circumstances, it is reasonable to infer a warranty that the product would not harm plaintiff's skin. While an idiosyncratic reaction may provide a defense in most implied warranty cases, in which the warranty is only that most people could use the product for the general purpose for which it was made (see *Magic Fingers*, 49 Ill. App. 3d 724, 364 N.E.2d 605; *Mullen*, 32 Ill. App. 3d 122, 336 N.E.2d 338; *Van Winkle*, 117 Ill. App. 2d 324, 253 N.E.2d 588), idiosyncrasy is not a defense when the warranty implied by the circumstances of the transaction is more specific, as it was in this case. (See *Malawy*, 150 Ill. App. 3d at 560.) Therefore, we affirm the finding of liability, and the award of $1,250 in damages on the implied warranty count.

## II. CONSUMER FRAUD ACT

The trial court premised its award of attorney fees on both the implied warranty count and the Consumer Fraud Act count, without distinguishing the portion of the award attributable to each count. The award of damages is fully supported by the verdict on implied warranty, but no identifiable part of the award of fees is supported by the implied warranty count alone. We must address defendants' arguments concerning the Consumer Fraud Act to determine the propriety of the award of fees.

Defendants argue that this court should vacate the finding of liability on the Consumer Fraud Act count because the trial court should not have allowed the jury to try this count. Although defendants failed to raise this issue in the trial court, the record contains facts sufficient for resolution of the issue, so we have discretion to address the issue. (134 Ill. 2d R. 366(a)(5); *Wozniak v. Segal* (1974), 56 Ill. 2d

457, 308 N.E.2d 611; *McClure v. Suter* (1978), 63 Ill. App. 3d 378, 379 N.E.2d 1376.) We choose to exercise that discretion in this case.

The Consumer Fraud Act does not authorize jury trials. (*Richard/Allen/Winter, Ltd. v. Waldorf* (1987), 156 Ill. App. 3d 717, 725, 509 N.E.2d 1078.) The trial court improperly delegated its fact-finding function on the consumer fraud charge to the jury. Therefore, we vacate the finding of liability under the Consumer Fraud Act and the award of attorney fees. We remand the case for determination of whether defendants are liable under the Consumer Fraud Act. Of course, the trial court is not bound by the jury's finding of the amount of defendant's liability if it finds defendants liable under the Act.

Defendants also argue that the consumer fraud action was time barred, the verdict was inconsistent with the verdict for defendants on common law fraud and plaintiff failed to show a pattern of deceptive practices or an intent to deceive. Although defendants waived several of these issues by failing to raise them in the post-trial motion (*Brown v. Decatur Memorial Hospital* (1980), 83 Ill. 2d 344, 415 N.E.2d 337), we address them here because they are likely to arise at the bench trial on remand.

As defendants point out, some decisions of the appellate court indicate that plaintiff must show a pattern of deceptive practices to succeed on a claim under the Consumer Fraud Act (*e.g., Frahm v. Urkovich* (1983), 113 Ill. App. 3d 580, 586, 447 N.E.2d 1007), while other decisions find proof of a single act sufficient to support a claim under the Act (*e.g., Warren v. LeMay* (1986), 142 Ill. App. 3d 550, 491 N.E.2d 464). In 1990 the legislature amended the Act to provide:

> "Proof of a public injury, a pattern, or an effect on consumers generally shall not be required." Ill. Rev. Stat. 1991, ch. 121½, par. 270(a).

Defendants ask this court not to use the amendment to construe the statute for this case. Our supreme court has held:

> "The principle has been established by this court that in ascertaining the intent of the General Assembly in the construction of a statute where no specific provision appears to aid such construction recourse may be had to the language of subsequent acts of the same law-making body. [Citation.] And these subsequent acts of the General Assembly may be amendments to the act being construed. [Citation.] *** [A] statutory amendment creates a presumption that it was intended to change the law ***. This presumption is not conclusive, and a subsequent

amendment does not necessarily indicate an intention to change the law as it previously existed. ***
***

The weight to be given a subsequent amendment in the construction of a statute and whether it will be held to be a manifestation of an intent to change the law as it previously existed or only a clarification of its terms, of course, must depend upon the circumstances involved." *Bruni v. Department of Registration & Education* (1974), 59 Ill. 2d 6, 11-12, 319 N.E.2d 37, 39-40.

In a criminal case the court found a subsequent amendment to the statute the court was construing

"extremely relevant ***. The reason is that an amendment to a statute is an appropriate source for determining the original legislative intent of the statute. [Citations.] Where, as here, an amendment is enacted soon after controversies have arisen regarding the statute amended, it is logical and reasonable to regard the amendment as a legislative interpretation of the original statute." *People v. Badoud* (1988), 122 Ill. 2d 50, 56, 521 N.E.2d 884, 887.

■ In this case, as in *Badoud*, plaintiff has overcome the presumption that the amendment was intended to change the statute by showing the conflict in the courts. (See *Herrerra v. Lester Engineering Co.* (1983), 116 Ill. App. 3d 228, 452 N.E.2d 68 (amendment to ambiguous statute does not indicate intent to change statute).) The amendment of the Consumer Fraud Act clarifies that the legislature intended to provide relief under the Act even for plaintiffs who can prove only a single deceptive act.

Application of the proper interpretation of the Consumer Fraud Act to this case does not violate the prohibition against *ex post facto* laws because the Act, whose meaning is unchanged by the amendment, was enacted prior to defendants' deceptive act, which occurred in 1986. Our supreme court has used amendments to aid in statutory interpretation even to support the imposition of criminal sanctions (see *Badoud*, 122 Ill. 2d 50, 521 N.E.2d 884; *People v. Bratcher* (1976), 63 Ill. 2d 534, 349 N.E.2d 31), for which the protection against *ex post facto* laws is most directly implicated (*People v. Nichols* (1978), 60 Ill. App. 3d 919, 377 N.E. 2d 815). Thus, the trial court properly concluded that plaintiff's complaint did not need to be supported by proof of a pattern or practice of deceptive acts; a single deceptive act is sufficient to support recovery under the Act.

Plaintiff's right to recovery is unaffected by her alleged failure to show an intent to deceive because "a violation of the Consumer Fraud Act may be based on an innocent or negligent misrepresentation as well as one that is intentional." *Carl Sandburg Village Condominium Association No. 1 v. First Condominium Development Co.* (1990), 197 Ill. App. 3d 948, 953, 557 N.E.2d 246.

■ Defendants contend that the action is time barred. The original complaint in this case was filed in March 1988, less than two years after plaintiff purchased the makeup remover. The cause of action for violation of the Consumer Fraud Act arose from the same transaction and occurrences set forth in the original complaint. Since the original complaint was filed before the running of the limitations period of the Act, the count based on the Consumer Fraud Act is not time barred. Ill. Rev. Stat. 1991, ch. 110, par. 2—616(b).

■ Defendants contend that a verdict for plaintiff on consumer fraud is inconsistent with the verdict for defendants on common law fraud. In *Zimmerman v. Northfield Real Estate, Inc.* (1986), 156 Ill. App. 3d 154, 168, 510 N.E.2d 409, the court held that the Act

> "expands a consumer's rights beyond those of the common law and provides broader protection than does the common law action of fraud. [Citation.] Thus, plaintiffs need not establish all of the elements of fraud."

The verdict for defendants on common law fraud is, thus, not inconsistent with the verdict for plaintiff under the Act. The trial court may, on remand, find defendants liable for violation of the Consumer Fraud Act based upon a single act of innocent misrepresentation while remaining consistent with the finding for defendants on the charge of common law fraud.

If the court finds defendants liable, it should first determine the amount of damages, which should be offset by plaintiff's recovery of $1,250 for breach of implied warranty to prevent double recovery. Then the court must determine appropriate attorney fees.

### III. ATTORNEY FEES

Defendants admit that the award of attorney fees in cases under the Consumer Fraud Act is within the discretion of the trial court (see *Haskell v. Blumthal* (1990), 204 Ill. App. 3d 596, 600, 561 N.E.2d 1315), but they argue that the trial court cannot award fees for the implied warranty count. Although defendants waived this argument, we address it here because the case must be remanded for a determination of liability under the Consumer Fraud Act. Plaintiff claimed in the trial court that her right to fees for the implied warranty count

was established by the Magnuson-Moss Warranty Act (Warranty Act) (15 U.S.C. §2301 *et seq.* (1988)). Defendants argue that in this personal injury action based on State law of implied warranty, the Warranty Act cannot support an award of fees.

■ Plaintiff charged defendants with breach of implied warranty in violation of both the Uniform Commercial Code and the Warranty Act. 15 U.S.C. §2311(b)(2) (1988) provides that, with exceptions not pertinent to this case, nothing in the Warranty Act

"shall (A) affect the liability of, or impose liability on, any person for personal injury, or (B) supersede any provision of State law regarding consequential damages for injury to the person or other injury."

Federal courts have interpreted this section to mean that "personal injury claims arising from breach of warranty are not cognizable under the [Warranty Act]." (*Boelens v. Redman Homes, Inc.* (5th Cir. 1984), 748 F.2d 1058, 1060.) Plaintiff alleged breach of implied warranty as a basis for recovery only for personal injuries. Plaintiff failed to state a claim cognizable under the Warranty Act, so her claim for fees based on that act must also fail. *Washington v. Otasco, Inc.* (N.D. Miss. 1985), 603 F. Supp. 1295.

Plaintiff succeeded on her implied warranty claim under the Uniform Commercial Code, which does not provide for the award of attorney fees. Illinois courts will not award attorney fees unless fees are specifically authorized by statute or provided for by contract between the parties. (*McCormick v. McCormick* (1988), 180 Ill. App. 3d 184, 212, 536 N.E.2d 419.) Thus, the trial court should not have awarded fees based on the implied warranty count. On remand, the trial court should award fees only if it finds defendants liable under the Consumer Fraud Act, and it should award only the fees expended on that count. Thus, if plaintiff is successful in her claim for consumer fraud, she must, to the extent possible, distinguish fees incurred on the implied warranty count from fees incurred on the Consumer Fraud Act count. See *Chesrow v. Du Page Auto Brokers, Inc.* (1990), 200 Ill. App. 3d 72, 557 N.E.2d 1301.

Finally, plaintiff seeks to recover attorney fees incurred on this appeal. The Consumer Fraud Act authorizes the award of appellate fees. (*Warren v. LeMay,* 142 Ill. App. 3d at 584, 491 N.E.2d at 485.) Since fees cannot be based on the implied warranty count, the request for fees incurred in preparing that part of the appeal is denied. If the trial court finds defendants liable under the Act, it may award plaintiff appellate attorney fees for work on the consumer fraud count along with fees incurred on remand.

Again, the trial court should, to the extent possible, distinguish fees incurred on appeal of the consumer fraud count from fees incurred on appeal of the implied warranty count, and award only the former.

For the reasons stated above, we affirm the judgment entered on the jury verdict finding defendants liable for breach of implied warranty, we vacate the judgment on the Consumer Fraud Act count and the award of attorney fees, and we remand for a determination of defendants' liability for consumer fraud and appropriate attorney fees.

Affirmed in part; vacated in part and remanded with directions.

HARTMAN, P.J., and SCARIANO, J., concur.