**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 150689-U

Order filed April 22, 2020

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) | |
| v. | ) ) | Appeal No. 3-15-0689 Circuit No. 15-CF-64 |
| | ) | |
| JATERRIUS L. YANKAWAY, | ) ) | Honorable David A. Brown, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE WRIGHT delivered the judgment of the court.
Presiding Justice Lytton and Justice McDade concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The UUWF statute did not, on its face, violate the second amendment. Additionally, defendant's informal letter to the court seeking treatment for substance abuse and an undisclosed medical issue was insufficient to trigger the need for a *Krankel* inquiry.

¶ 2    On July 15, 2015, a Peoria County jury found defendant Jaterrius L. Yankaway guilty of unlawful possession of a weapon by a felon. The trial court sentenced defendant to three-and-a-half years' imprisonment in the Illinois Department of Corrections. On appeal, defendant argues a reversal of his conviction is warranted because section 24-1.1(a) of the Criminal Code of 2012

is facially unconstitutional. Additionally, defendant alleges the trial court erred by failing to conduct a preliminary *Krankel* inquiry into defendant's *pro se* allegations of ineffective assistance of counsel. We affirm.

¶ 3                                                    FACTS

¶ 4        On February 10, 2015, the State charged defendant Jaterrius L. Yankaway by indictment with unlawful possession of a weapon by a felon and reckless discharge of a firearm. Count I of the indictment alleged that defendant committed unlawful possession of a weapon by a felon pursuant to section 24-1.1(a) of the Criminal Code of 2012 (720 ILCS 5/24-1.1(a) (West 2014)) in that defendant, who had previously been convicted of the felony offense of unlawful possession of a stolen vehicle, had a handgun in his possession on or about January 21, 2015. Count II alleged that defendant committed reckless discharge of a firearm pursuant to section 24-1.5(a) of the Criminal Code of 2012 (720 ILCS 5/24-1.5(a) (West 2014)) in that defendant, while acting in a reckless manner, discharged a firearm thereby endangering the bodily safety of Kiante Gordon.

¶ 5        On February 19, 2015, public defender Hugh F. Toner entered an appearance on behalf of defendant and continued to represent defendant for the remainder of the case. On April 29, 2015, the trial court received a letter dated April 26, 2015, from defendant. The letter, which requested the court help defendant overcome his substance abuse and unknown medical issues, *inter alia*, stated in relevant part:

      "I need rehab I have a bad drinking promble [*sic*] because I do not know how to cope with life from growing up in jail cell I want to do better your honor. I would like you to look into Human Service Center if a Mental Health Services and Substance Abuse Treatment that would really help me cope and better myself this what I need. Your honor

2

I need another chance can you look into probation and this service. Also I need to get this medical promble [*sic*] tooken [*sic*] care of sir the county said it's nothing they can do so can you look into a medical release. Sir as I sit in the county jail and look around I'm tired of this life I don't want nothing to do with it all. Only if you can see the good in me sir. I was even told from my lawyer that he should let me die in jail and that I should be lock up because the way I talk and that I was a goof ball. Your honor just from me hearing them words I want to show every one I can do something with my life I'm tired of people putting me down please give me the chance to show everyone. Your honor can I have another chance I do not want to see IDOC I'm scared of that place and I would like to stay scared of it. Can I get a medical release to show you I can do good."

¶ 6    Defendant's jury trial began on July 13, 2015. The State's evidence established that on January 21, 2015, defendant, Kiante Gordon, "Deangelo," Marty McGhee, and Machael Webster, who were all friends, were in Gordon's 1997 Ford Taurus. Deangelo drove the car, Gordon sat in the front passenger's seat, McGhee sat behind the driver's seat, Webster sat in the back middle seat, and defendant sat behind the passenger's seat. The group drove to Forrest Hill Liquors where defendant went into the store. Defendant then reentered the vehicle and again sat behind Gordon. No arguing or fighting occurred in the vehicle. After leaving the store, a gunshot was fired while the car was moving. Gordon was struck with the bullet which went through her back and stomach and grazed her right arm.

¶ 7    Both Gordon and Webster identified defendant as the shooter in photo lineups. Both Gordon and Webster also testified that the shooting was an accident. Law enforcement also opined that the shooting was "probably an accident." The State presented exhibits showing a hole in the front and the back of the front passenger seat. The holes were consistent with a small

3

caliber bullet and were about torso height. There were no bullet holes to the exterior or windows of the vehicle, and no bullet was ever recovered.

¶ 8        At the close of the State's evidence defendant moved for directed verdicts. The trial court denied defendant's motion pertaining to count I, but granted defendant's motion with regard to count II, reasoning that the State presented no evidence showing that defendant "placed somebody at substantial risk."

¶ 9        Next, the parties stipulated that defendant had been convicted of felony unlawful possession of a stolen motor vehicle in Peoria County case No. 13-CF-119. Lastly, defendant testified that he did not see or possess a gun on the date of the shooting.

¶ 10        The jury found defendant guilty of unlawful possession of a weapon by a felon as alleged in count I. On September 25, 2015, the trial court denied defendant's timely motion for a new trial and sentenced defendant to three-and-a-half years' of imprisonment in the Illinois Department of Corrections. On September 28, 2015, the trial court denied defendant's motion to reconsider sentence. Defendant appeals.

¶ 11                                ANALYSIS

¶ 12        On appeal, defendant asks this court to set aside his conviction for the offense of unlawful use or possession of weapons by a felon (UUWF) because section 24-1.1(a) of the Criminal Code of 2012 is facially unconstitutional. Defendant contends that the UUWF statute violates defendant's right to keep and bear arms, as guaranteed by the second amendment of the United States Constitution. (U.S. Const., amend. II). Additionally, defendant submits that the trial court erred by failing to conduct a pretrial *Krankel* inquiry into defendant's pretrial *pro se* allegations of ineffective assistance of counsel. In response to defendant's contentions, the State

4

argues that the UUWF statute does not violate the second amendment of the United States Constitution and that a *Krankel* inquiry was unnecessary based on the facts of this case.

¶ 13                              I. Constitutionality of the UUWF Statute

¶ 14        Defendant raises this constitutional challenge for the first time on appeal. However, constitutional challenges of criminal statutes may generally be raised at any time. *People v. Zeisler*, 125 Ill. 2d 42, 46 (1988).

¶ 15        The case law provides that reviewing courts resolve any doubts concerning the construction of a statute in favor of the statute's validity based on the presumption that statutes are constitutional. *People v. One 1998 GMC*, 2011 IL 110236, ¶ 20. "To overcome this presumption, the party challenging the constitutionality of a statute has the burden of clearly establishing that it violates the constitution." *People v. Chairez*, 2018 IL 121417, ¶ 15. A successful facial attack on the constitutionality of a statute serves to render the statute void concerning all its applications. *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 306 (2008). The constitutional validity of a statute is a question of law subject to *de novo* review. *One 1998 GMC,* 2011 IL 110236, ¶ 20.

¶ 16        When analyzing the constitutionality of a restriction upon a citizen's right to bear arms under the second amendment, reviewing courts apply a two-prong approach. *Wilson v. County of Cook*, 2012 IL 112026, ¶ 41; *People v. Mosley*, 2015 IL 115872, ¶ 34; *Chairez*, 2018 IL 121417, ¶ 21. First, reviewing courts "conduct a textual and historical analysis of the second amendment to determine whether the challenged law imposes a burden on conduct that was understood to be within the scope of the second amendment's protection at the time of ratification." (Internal quotation marks omitted.) *Chairez*, 2018 IL 121417, ¶ 21. Where the outcome of the historical analysis is either inconclusive or reveals the regulated activity clearly falls within the category of

5

conduct protected by the second amendment, then reviewing courts must go on to scrutinize the government's justification for restricting or regulating second amendment rights. *Id*.

¶ 17    Before conducting the first step pertaining to a historical analysis, we consider the statutory language of the UUWF statute at issue. The statute provides that:

> "It is unlawful for a person to knowingly possess on or about his person or on his land or in his own abode or fixed place of business any weapon prohibited under Section 24-1 of this Act or any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction." 720 ILCS 5/24-1.1(a) (West 2014).

Clearly, this statute categorically prohibits all convicted felons from possessing a firearm.

¶ 18    The case law recognizes that the second amendment guarantees an individual the right to bear arms but provides the right is "not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). The United State Supreme Court in *Heller*, stated that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons ***." *Heller*, 554 U.S. 570 at 626. The United States Supreme Court in *McDonald v. City of Chicago, Illinois*, 561 U.S. 742, 786 (2010), along with our supreme court in *Chairez*, 2018 IL 121417, ¶ 24, have echoed *Heller's* pronouncement. "With respect to the second amendment, in its normal application, the [UUWF] statute is a presumptively lawful longstanding prohibition on the possession of firearms." (Internal quotation marks omitted.) *People v. McFadden*, 2016 IL 117424, ¶ 35.

¶ 19    In *McFadden*, our supreme court stated that the defendant "has not shown that his conduct was entitled to second amendment protections, which are held by law-abiding responsible citizens." (Internal quotation marks omitted.) *Id*. ¶ 36; See *Heller*, 554 U.S. 570 at

6

635. The holding in *McFadden* seems to indicate that the possession of firearms by felons historically falls outside of the scope of the second amendment's protection.

¶ 20 However, defendant argues that some courts have found the historical data is inconclusive concerning whether the scope of the second amendment's protections applies to all citizens, including convicted felons. Recently, our supreme court's decision in *Chairez* provides Illinois courts with guidance on the second amendment issue. See *Chairez*, 2018 IL 121417. In *Chairez*, our supreme court instructs that the level of scrutiny to be applied when evaluating the constitutionality of a statute impacting second amendment rights must be based on a sliding scale. *Id*. ¶ 35. Our supreme court held that one end of the intermediate scrutiny scale applies to statutes that categorically restrict the possession of firearms by non law-abiding citizens, or, in other words, convicted felons. *Id*. ¶ 36 (citing *United States v. Williams*, 616 F.3d 685 (2010)). At this end of the scale, a statute may be upheld as constitutional if it is substantially related to an important government interest. *Id*. ¶¶ 37, 38; *U.S. v. Skoien*, 614 F.3d 638, 641 (2010); *Williams*, 616 F.3d at 692-94. On the other end of the sliding scale of intermediate scrutiny, a statute is subject to heightened scrutiny where that statute restricts the second amendment rights of "law-abiding, responsible citizens." *Id*. ¶ 39. Where a statute impacts the rights of law-abiding citizens to bear arms, the case law requires actual evidence supporting the government's justification, not mere speculative claims that such restrictions are necessary to protect the public health and safety. *Id*.; *Ezell v. City of Chicago*, 651 F.3d 684, 708-10 (2011); *Moore v. Madigan*, 702 F.3d 933, 940.

¶ 21 In this case, it is undisputed that defendant is a convicted felon, and thus, not a "law-abiding citizen." Based on the rationale of *Chairez*, we scrutinize the UUWF statute less rigorously than we would scrutinize the government's justification for legislation impacting all

law-abiding citizens. Accordingly, we must consider whether the restrictions contained in the UUWF statute are substantially related to an important government interest. See *Chairez*, 2018 IL 121417; *Williams*, 616 F.3d at 692-94.

¶ 22    Having clarified that this court must evaluate the government's stated purpose with regard to the UUWF statute with something less than strict scrutiny, we note that several Illinois courts have echoed the opinion that public safety is an important, substantial, or even a compelling government interest. *People v. Ross*, 407 Ill. App. 3d 931, 942 (2011); *People v. Robinson*, 2011 IL App (1st) 100078, ¶ 26. *People v. Badoud*, 122 Ill. 2d 50, 62 (1988). Yet, defendant claims the UUWF statute is overly broad because it impacts the second amendment rights of felons that have not been convicted of crimes involving any propensity toward violence.

¶ 23    We recognize that many convicted felons have committed nonviolent offenses. Yet, when the United States Supreme Court issued their decision in *McDonald v. City of Chicago, Illinois*, 561 U.S. 742 (2010), the existing range of felony offenses included both violent and nonviolent conduct. Importantly, in *McDonald,* our supreme court reminded the reader that "the Second Amendment protects the right to keep and bear arms for the purpose of self-defense." *Id*. at 749-50. Significantly, the *McDonald* court found it necessary to repeat those assurances with regard to the right to bear arms for self-defense.

¶ 24    We are mindful that great caution is required before restricting any citizen's second amendment rights. However, due process has been afforded to every citizen that stands convicted of a felony offense. Consequently, the Seventh Circuit has reiterated that "someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use." *United States v. Yancey*, 621 F.3d 681, 685 (2010); See *United States v. Lane*, 252 F.3d 905, 906 (2001).

8

¶ 25    Arming law-abiding citizens for the purpose of self-defense and other lawful hobbies and endeavors is a constitutionally protected second amendment right. However, allowing convicted felons to acquire, possess, or retain weapons after previously demonstrating their inability to comply with the rules of an ordered society is counter to the government's interests in promoting public safety. Thus, the prevailing case law leads us to the conclusion that the UUWF statute is substantially related to the important government interest of promoting public safety by protecting the public from encountering an armed, convicted felon.

¶ 26                                II. *Krankel* Inquiry

¶ 27    Next, defendant brings our attention to an *ex parte* communication he sent to the court in the form of a letter. Without question, the trial court properly shared the *ex parte*, but pretrial, communication with both the prosecution and defense counsel. Beyond sharing the *ex parte* communication, defendant argues that the trial court should have acted on information contained in this pretrial letter by initiating a *Krankel* hearing. Whether defendant's recitation of trial counsel's commentary should have triggered a *Krankel* inquiry is a question of law subject to *de novo* review. *People v. Taylor*, 237 Ill. 2d 68, 75 (2010).

¶ 28    Defendant's *Krankel* arguments are misplaced for several reasons. First, the *Krankel* inquiry is designed for the narrow purpose of empowering the trial court to decide whether to appoint separate counsel for a defendant who makes *pro se* ineffective assistance claims following a conviction and in a posttrial context. In other words, when a defendant wishes to raise ineffective assistance claims against trial counsel in a posttrial motion, the *Krankel* inquiry may guide the trial court to appoint new counsel to assist a *pro se* defendant to bring such claims to light.

9

¶ 29    On appeal, defendant requests that his conviction should be set aside because a *Krankel* inquiry did not occur based on the pretrial conduct of defense counsel. Ironically, neither defendant's posttrial motions filed in the trial court nor the issues raised in this appeal include complaints about trial counsel's performance. In fact, we note that trial counsel secured a directed verdict in favor of defendant on count II, alleging that defendant committed the offense of reckless discharge of a firearm.

¶ 30    We observe that the contents of defendant's pretrial correspondence with the court failed to expressly claim that defense counsel was unfairly biased against defendant or ineffective. While an ineffective assistance claim need not be conventional, the claim must expressly complain about counsel's performance. *Taylor*, 237 Ill. 2d at 76. When read in context, defendant's rambling letter was directed toward defendant's own concerns about his health, his current incarceration, his future, and his desire to prove to others that he could do better, and was not about the performance of his attorney. Nowhere in defendant's letter did defendant expressly complain about his attorney's blunt language as negatively impacting defense counsel's performance.

¶ 31    Further, defendant argues that the letter revealed a *per se* conflict of interest existed between defendant and his attorney pursuant to Comment 2 of Rule 6.2 of the Illinois Rules of Professional Conduct. We conclude this argument is unpersuasive. Comment 2 of Rule 6.2 states:

"Appointed Counsel

[2] For good cause a lawyer may seek to decline an appointment to represent a person who cannot afford to retain counsel or whose cause is unpopular. Good cause exists if the lawyer could not handle the matter competently, see Rule 1.1, or if

10

undertaking the representation would result in an improper conflict of interest, for

example, when the client or the cause is so repugnant to the lawyer as to be likely to

impair the client-lawyer relationship or the lawyer's ability to represent the client. A

lawyer may also *seek to decline an appointment if acceptance* would be unreasonably

burdensome, for example, when it would impose a financial sacrifice so great as to be

unjust." (Ill. R. Prof. Conduct (2009) R. 6.2 (eff. Jan. 1, 2010)). (Emphasis added.)

When read as a whole, and in conjunction with the text of Rule 6.2, we observe that comment 2

of Rule 6.2 of the Illinois Rules of Professional Conduct provides examples of situations where

just cause may support an attorney's decision to decline representation of an individual.

Comment 2 of Rule 6.2 uses permissive language rather than imposing a mandatory duty on

defense counsel to step aside when clients become difficult or when strongly worded advice

becomes necessary as part of a competent approach to a defense. Ultimately, Rule 6.2 was not

constructed to provide defendants with an avenue to inject ineffective assistance of counsel

claims when an attorney uses abrasive language.

¶ 32     Further, a *per se* conflict of interest exists:

"(1) where defense counsel has a prior or contemporaneous association with the

victim, the prosecution, or an entity assisting the prosecution; (2) where defense counsel

contemporaneously represents a prosecution witness; and (3) where defense counsel was

a former prosecutor who had been personally involved with the prosecution of

defendant." *People v. Fields*, 2012 IL 112438, ¶ 18.

Accordingly, defendant's claim does not fall into any of the recognized scenarios in which a

*per se* conflict of interest can exist.

11

¶ 33    Ultimately, defendant's letter did not expressly complain about counsel's performance and did not reveal that defense counsel had a *per se* conflict of interest as set forth above. We struggle to imagine any scenario that should have caused the trial court to have reasonably interpreted that defendant's pretrial letter contained an express ineffective assistance of counsel claim. Thus, we hold that defendant's statement was insufficient to trigger a *Krankel* inquiry in this case.

¶ 34                                CONCLUSION

¶ 35    The judgment of the circuit court of Peoria County is affirmed.

¶ 36    Affirmed.